**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
1091 North Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONEL ZAMORA, Derivatively on Behalf of Nominal Defendant CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> FRANK LITVACK, LINDA MARBÁN, PAUL G. AUWAERTER, GEORGE W. DUNBAR, JR., PHILIP J. GOTWALS, MICHAEL KELLIHER, DAVID B. MUSKET, and KARIMAH ES SABAR, <br><br> Defendants, <br><br> and <br><br> CAPRICOR THERAPEUTICS, INC., <br><br> Nominal Defendant. | Case No. **'25 CV 1969 GPC SBC** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Leonel Zamora ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Capricor Therapeutics, Inc. ("Capricor" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Capricor, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Capricor against certain officers and members of the Company's Board for breaches of their fiduciary duties and other violations of law from October 9, 2024 and July 10, 2025, 2024, inclusive (the "Relevant Period"), as set forth below.

2.      According to its public filings, Capricor is a biotechnology company dedicated to advancing transformative cell and exosome-based therapeutics to redefine the treatment landscape for rare diseases. The Company claims that at the forefront of its innovation is its lead product candidate, deramiocel, an allogeneic cardiac-derived cell therapy, and that preclinical and clinical studies have shown deramiocel to exert potent immunomodulatory and anti-fibrotic actions in the preservation of cardiac and skeletal muscle function in muscular dystrophies such as Duchenne Muscular Dystrophy ("DMD").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3.      As alleged in greater detail below, during the Relevant Period, Defendants made various positive statements to investors regarding, *inter alia*, the Company's ability to obtain a Biologics License Application ("BLA") for deramiocel from the United States Food and Drug Administration (the "FDA").

4.      On May 5, 2025, the Company issued a press release wherein it announced that it completed a mid-cycle review meeting with the FDA regarding deramiocel for the treatment of DMD. Defendants stated that no significant deficiencies were identified by the review committee. Moreover, Defendants reported that the package was on track for a Prescription Drug User Fee Act ("PDUFA") action date of August 31, 2025, and the FDA confirmed that it would hold an advisory committee meeting.

5.      Following this news, the Company's stock price fell from $10.30 per share to $7.30 per share.

6.      Subsequently, *Stat News* reported that the director of the FDA's Center for Biologics Evaluation and Research ("CBER"), Vinjay Prasad ("Prasad"), canceled the advisory committee meeting after being "skeptical of the treatment" and uncertain about deramiocel's efficacy and safety.

7.      Following this news, the Company's stock price fell from $11.94 per share on June 18, 2025 to $8.26 per share on June 20, 2025.

8.      Then on July 11, 2025, the Company issued a press release wherein it

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

announced that it received a Complete Response Letter ("CRL") from the FDA, which denied the BLA and cited that it did not meet the statutory requirement for substantial evidence of effectiveness and the need for additional clinical data. Moreover, the CRL referenced outstanding items in the Chemistry, Manufacturing, and Controls ("CMC") section of the application.

9.      Following this news, the Company's stock price fell from $11.40 per share on July 10, 2025 to $7.64 per share on July 11, 2025.

10.     As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *Leong v. Capricor Therapeutics, Inc.*, Case No. 3:25-cv-01815 (S.D. Cal.) (the "Securities Class Action").

11.     The Securities Class Action has caused, and will continue to cause, Capricor to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC, and Section 10(b) of the Exchange Act and Rule 10b-5 (17

C.F.R.§240.10b-5) promulgated thereunder.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

17.    Plaintiff is, and has been at all relevant times, a shareholder of Capricor.

*Nominal Defendant*

18.    Nominal Defendant Capricor is incorporated under the laws of the State of Delaware with its principal executive offices located at 10865 Road to the Cure,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Suite 150, San Diego, California 92121. Capricor's common stock is traded on the NASDAQ under the ticker symbol "CAPR."

***Individual Defendants***

19.     Defendant Frank Litvack ("Litvack") has served as Executive Chairman of the Board since November 2013. Litvack has served as a member of the board of directors of Capricor, Inc., a wholly-owned subsidiary of the Company, since 2012.

20.     Defendant Linda Marbán ("Marbán") has served as Chief Executive Officer ("CEO") and a director of the Company since November 2013. She is a co-founder of Capricor, Inc. Marbán has been named as a defendant in the Securities Class Action.

21.     Defendant Paul G. Auwaerter ("Auwaerter") has served as a director of the Company since July 2023.

22.     Defendant George W. Dunbar, Jr. ("Dunbar") has served as a director of the Company since 2013. Dunbar has served as a member of the Capricor, Inc. board of directors since 2012. Dunbar is a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

23.     Defendant Philip J. Gotwals ("Gotwals") has served as a director of the Company since July 2023.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.    Defendant Michael Kelliher ("Kelliher") has served as a director of the Company since September 2023.

25.    Defendant David B. Musket ("Musket") has served as a director of the Company since November 2013. Musket has served as a member of the Capricor, Inc. board of directors since 2012. Musket is Chair of the Audit Committee and Chair of the Compensation Committee.

26.    Defendant Karimah Es Sabar ("Es Sabar") has served as a director of the Company since July 2021. Es Sabar is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

27.    Defendants referenced in paragraphs 19 through 26 are herein referred to as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28.    By reason of their positions as officers and/or directors of Capricor, and because of their ability to control the business and corporate affairs of Capricor, the Individual Defendants owed Capricor and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Capricor in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Capricor and its shareholders.

29.    Each director and officer of the Company owes to Capricor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Capricor, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of Capricor were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Capricor, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fairly presented information.

34.   To discharge their duties, the officers and directors of Capricor were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Capricor were required to, among other things:

(i)   Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Capricor's own Code of Business Conduct and Ethics ("Code of Conduct");

(ii)   Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)   Remain informed as to how Capricor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)   Establish and maintain systematic and accurate records and reports of the business and internal affairs of Capricor and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)   Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Capricor's operations would comply with all applicable laws and Capricor's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

35.    Each of the Individual Defendants further owed to Capricor and the shareholders the duty of loyalty requiring that each favor Capricor's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

36.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Capricor and were at all times acting within the course and scope of such agency.

37.    Because of their advisory, executive, managerial, and directorial positions with Capricor, each of the Individual Defendants had access to adverse, non-public information about the Company.

38.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Capricor.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## CAPRICOR'S CODE OF CONDUCT

39.    Capricor's Code of Conduct states:

This Code of Business Conduct and Ethics (this "Code") was adopted by the Board of Directors (the "Board") of Capricor Therapeutics, Inc. (the "Company") on November 22, 2013 and revised in April 2021.

This Code contains general guidelines for conducting the business of the Company consistent with the highest standards of business conduct and ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, we adhere to these higher standards.

This Code applies to all of our directors, officers and employees. We refer to all persons covered by this Code as "Company employees" or simply "employees." We also refer to our Chief Executive Officer, Chief Financial Officer, and General Counsel as our "Principal Corporate Officers." Supervisors are also expected to ensure that all agents, consultants and contractors conform to Code standards when providing services to or on behalf of the Company.

40.    According to the Code of Conduct:

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, strategic partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

41.    Moreover, the Code of Conduct provides:

As a public company, we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company's Principal Corporate Officers and other employees working in the Finance and Accounting Departments have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

Each employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each employee must fully cooperate with the Company's Finance and Accounting Departments, as well as the Company's independent public accountants and counsel. Additionally, each employee who is involved in the Company's disclosure process must:

• be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

• take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

U.S. federal securities law requires the Company to maintain proper internal books and records and to devise and maintain an adequate system of internal accounting controls. The Securities and Exchange Commission ("SEC") has supplemented the statutory requirements by adopting rules that prohibit (i) any person from falsifying records or accounts subject to the above requirements and (ii) officers or directors from making any materially false, misleading or incomplete statement to an accountant in connection with an audit or any filing with the SEC. These provisions reflect the SEC's intent to discourage officers, directors and other persons with access to the Company's books and records from taking action that might result in the communication of materially misleading financial information to the investing public.

42.     The Code of Conduct continues:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Each employee has an obligation to comply, both in letter and spirit, with all laws, rules and regulations applicable to the Company. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices (including the Foreign Corrupt Practices Act discussed below), offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or a Principal Corporate Officer. . . .

Company employees are prohibited from trading in the stock or other securities of the Company while in possession of material, nonpublic information about the Company or its subsidiaries, if any. In addition, Company employees are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell stock or other securities of the Company on the basis of material nonpublic information. Employees who obtain material nonpublic information about another company in the course of their employment are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including termination of employment. You are required to read carefully and observe our Insider Trading Policy, as may be amended from time to time. Please inform your supervisor or a Principal Corporate Officer if you do not have a copy of our Insider Trading Policy.

## **CAPRICOR'S AUDIT COMMITTEE CHARTER**

43.    Pursuant to Capricor's Audit Committee Charter:

The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In addition to the powers and responsibilities expressly delegated to the Committee in this Charter, the Committee may exercise any other powers and carry out any other responsibilities delegated to it by the Board from time to time consistent with the Company's bylaws. The powers and responsibilities delegated by the Board to the Committee in this Charter or otherwise shall be exercised and carried out by the Committee as it deems appropriate without requirement of Board approval, and any decision made by the Committee (including any decision to exercise or refrain from exercising any of the powers delegated to the Committee hereunder) shall be at the Committee's sole discretion. While acting within the scope of the powers and responsibilities delegated to it, the Committee shall have and may exercise all the powers and authority of the Board. To the fullest extent permitted by law, the Committee shall have the power to determine which matters are within the scope of the powers and responsibilities delegated to it. The approval of this Charter shall be construed as a delegation of authority to the Committee with respect to the responsibilities set forth herein. . . .

44.    The powers and responsibilities of the Audit Committee include the following:

The Committee shall review and discuss the annual audited financial statements (including the related notes) with management and the independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form10-K before the Form 10-K is filed. . . .

The Committee shall review and discuss the quarterly financial statements with management and the independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form10-Q before the Form 10-Q is filed. . . .

The Committee shall review, discuss with management and the independent auditors, as appropriate, and approve earnings press releases and press releases containing other financial information, as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

14. The Committee shall review the Company's compliance with applicable laws and regulations and review and oversee any policies, procedures and programs designed to promote such compliance.

15. The Committee shall review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules. . . .

17. The Committee shall discuss with management and the independent auditors any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies, in accordance with the terms of the Company's "Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud or Auditing Matters," as applicable.

18. The Committee shall discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

19. The Committee shall review and discuss with management and the independent auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

20. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also establish procedures for the confidential and anonymous submission by Company employees regarding questionable accounting or auditing matters.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21. The Committee shall provide the Company with the audit committee report required by the rules of the SEC to be included in each of the Company's annual proxy statements.

## SUBSTANTIVE ALLEGATIONS

**Background**

45.     According to its public filings, Capricor is a biotechnology company dedicated to advancing transformative cell and exosome-based therapeutics to redefine the treatment landscape for rare diseases.

46.     According to the Company, at the forefront of its innovation is its lead product candidate, deramiocel, an allogeneic cardiac-derived cell therapy, and that preclinical and clinical studies have shown deramiocel to exert potent immunomodulatory and anti-fibrotic actions in the preservation of cardiac and skeletal muscle function in muscular dystrophies such as DMD.

**Materially False and Misleading Statements**

47.     On October 9, 2024, the Company issued a press release wherein it announced that it initiated its submission process with the FDA for a BLA seeking full approval for deramiocel to treat patients with DMD cardiomyopathy. The press release provided:

Capricor plans to complete its rolling BLA submission by the end of 2024. The application may be eligible for priority review as deramiocel could potentially provide significant improvements in the safety and/or effectiveness of the treatment for the serious condition of DMD cardiomyopathy, where there are currently no approved treatment

16
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

options available. Once the rolling BLA submission is completed, the FDA will notify the Company when it is formally accepted for review.

48.    In the press release, Individual Defendant Marbán commented:

***This announcement marks an important step in the U.S. regulatory process towards a potential Biologics License Application approval of deramiocel for the treatment of DMD. An approval of deramiocel would allow us to expedite the delivery of this novel, first-in-class treatment to patients in need.***[1] We look forward to working with the FDA during this process.

49.    On November 13, 2024, the Company issued a press release wherein it reported financial results for the third quarter of 2024. The press release provided:

In addition, if deramiocel is approved, Capricor would be eligible to receive a Priority Review Voucher (PRV) based on our previous receipt of a rare pediatric disease designation.

***Based on FDA feedback and following Capricor's recent pre-BLA meeting in August, Capricor initiated the rolling BLA submission in October of 2024 seeking full approval of deramiocel for the treatment of DMD-cardiomyopathy with full submission expected to be complete by year end 2024.***

***The BLA submission will be based on existing cardiac data from the Phase 2 HOPE-2 and HOPE-2 open label extension (OLE) trials compared to patient-level natural history data.***

50.    In the press release, Marbán commented:

This has been a transformational quarter for Capricor as we move towards potential commercialization of deramiocel for the treatment of DMD. ***We have commenced the submission of our BLA which we expect to be complete by year end and we have significantly strengthened our balance sheet in order to scale up manufacturing as***

---

[1] Unless otherwise indicated, all emphasis is added.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*we anticipate a strong launch, pending FDA approval.*

51.    Also on November 13, 2024, the Company held an earnings call, during

which Marbán commented:

> As you know, we have been working to develop deramiocel, formerly
> known as CAP-1002, for the treatment of DMD for the last 8 years. ***We
> have shown in multiple clinical trials the salutary benefits of
> deramiocel in attenuating the consequences of the skeletal muscle
> myopathy and improving the cardiomyopathy associated with this
> devastating disease. We have consistently presented the data as it has
> become available to the FDA, and the data has shown clinically
> meaningful as well as statistically significant improvements. Based
> on the strength of the data as well as the large unmet medical need of
> the cardiac implications, we have decided after conferring with the
> FDA to file a BLA for full approval for the cardiomyopathy associated
> with DMD. . . .***
>
> ***It is a clear strategy, which gives Capricor the opportunity to achieve
> potential approval for a first-in-class treatment for one of the most
> devastating consequences of DMD. I am pleased to report that the
> first module of the BLA was submitted, and we are on track to fully
> submit our BLA package by year-end 2024.*** I want to thank my team
> for their extraordinary efforts to this point and reiterate that we are
> focusing all of our efforts on this endeavor. This includes preparations
> for CMC inspection, pre-commercial activities and market access work
> with our distribution partner, NS Pharma. ***While we believe that an
> AdCom may not be necessary, we are preparing internally for that
> eventuality.***

52.    In response to a question from an analyst at Piper Sandler, Marbán

stated:

> Q: Edward Andrew Tenthoff – Piper Sandler – Analyst: Obviously,
> there's a lot to do behind the scenes here with the filings and with the
> regulatory approval that you're seeking with the FDA. What are you
> and Nippon Shinyaku doing to prepare this market and to get ready for
> launch?

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A: Marbán: ***Now Capricor has joined in on the fact that we know CAP-1002 or deramiocel better than anybody else. So now we have put several of our people basically into the daily mix with Nippon Shinyaku to make sure that deramiocel is [ breeded ] and launched the way that it's supposed to. So the product is ready, delivery is ready, the centers are ready, infusion centers are ready.*** All of the bells and whistles have been managed. Market access has been assessed. KOLs have been brought on board. Physicians are ready to prescribe it. ***It is all underway at this time in regular standard meetings and opportunities. So that's going great, and we have great opportunities ahead for launch.***

In terms of your second question with manufacturing, we have been preparing for this day for a long time. ***So we started thinking about the commercialization of deramiocel, let's call it, a decade ago when we entered into the clinic. And so we knew what we had to do. The good thing is -- that we have done is we have kept manufacturing in-house all this time. So it's a derisked manufacturing procedure because nobody knows it better than we have.*** When we built the San Diego manufacturing facility, it's small, but it's commercial scale. So we know exactly how to do it. We've been preparing for PLI really for about 2 years since we designed and opened that facility. So that one is ready to go. We have high confidence that we should be able to pass inspection. And now because we are anticipating great adoption of deramiocel by Duchenne patients, we're also planning and executing a build-out of a new manufacturing facility.

53.    On March 4, 2025, the Company issued a press release wherein it reported that the FDA accepted its BLA for review seeking full approval of deramiocel for patients with DMD cardiomyopathy. The press release noted that the FDA granted BLA priority review with a PDUFA target date of August 31, 2025, and did not identify any potential review issues. Marbán commented:

We are thrilled to announce the acceptance of our BLA bringing us one step closer to providing this first-in-class treatment for Duchenne-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cardiomyopathy, a condition for which there are no approved therapies. If our application is successful, we expect deramiocel to be a lifelong treatment, administered quarterly, with the potential to be widely adopted across the DMD-cardiomyopathy treatment landscape. We want to extend our appreciation to the patients, their families and advocates who continue to work with Capricor and to the FDA for its commitment to accelerating treatments for DMD.

54.    On March 19, 2025, the Company issued a press release wherein it reported financial results for the fourth quarter and full year 2024. The press release provided:

**Fourth Quarter 2024 and Recent Developments**

**In March 2025, the FDA accepted Capricor's BLA seeking full approval of deramiocel for the treatment of individuals with Duchenne muscular dystrophy cardiomyopathy.** Our BLA has been granted Priority Review by the FDA, with a Prescription Drug User Fee Act (PDUFA) action date set for August 31, 2025. Deramiocel is a cellular therapy that consists of allogeneic cardiosphere-derived cells (CDCs), a rare population of cardiac cells that have been shown in preclinical and clinical studies to exert potent immunomodulatory and anti-fibrotic actions in preservation of cardiac and skeletal muscle function in DMD. CDCs act by secreting exosomes, which reduce fibrosis in muscle resulting in a reduction in myocardial scarring and cardiac inflammation by targeting macrophages to adopt a healing, rather than a pro-inflammatory phenotype. *The BLA submission for deramiocel included safety and efficacy data from Capricor's Phase 2 HOPE-2 placebo-controlled trial and the HOPE-2 open label extension (OLE) trial compared to natural history data from an FDA-funded and published dataset on the implications of DMD cardiomyopathy and potential biomarkers of disease progression. The results from these clinical studies demonstrated statistically significant and clinically relevant improvements in cardiac function up to three-years after treatment as well as a consistent safety profile.* Capricor's ongoing HOPE-3 Phase 3 study which is assessing skeletal muscle function has not been requested for review by the FDA for this application.

**Expanded internal manufacturing capacity for deramiocel production:** In February 2025, Capricor entered into an amendment to its current lease for additional GMP space in its headquarters located in San Diego, California to support additional commercial manufacturing capacity and throughput.

55.    Marbán further commented:

*2024 was a transformational year for Capricor and the patients we serve as we move closer to our goal of bringing the first cellular therapy to market for the treatment of Duchenne-cardiomyopathy, a condition for which there are no approved therapies. We continue to work diligently towards our August 31, 2025 action date for our deramiocel Biologics License Application, directly engaging with the FDA, preparing for pre-approval licensure inspection and preparing for potential commercial launch with our partner Nippon Shinyaku Co. (U.S. subsidiary: NS Pharma Inc).* Our BLA is the culmination of a body of work that has been focused on bringing this transformational therapy to those patients in need with the potential to alter the trajectory of this degenerative disease**. *In addition to our operational achievements, we ended the year with over $150 million on our balance sheet allowing us to invest diligently in manufacturing expansion and commercial endeavors as we work to bring deramiocel to the Duchenne community in the United States and abroad.*

56.    Also on March 19, 2025, the Company held an earnings call, during which Marbán stated:

As we look ahead to our PDUFA date, set for August 31, 2025, we are working with the FDA as they are actively reviewing our application. At this time, the FDA has not indicated to us whether an AdCom will be necessary, but we are preparing for one should that be needed. And I'm pleased to inform you that we have officially scheduled our PLI, or pre-licensing inspection, of our manufacturing facility, which is set for the second quarter of this year.

*Our BLA is supported with data from 2 trials: our Phase II HOPE-2 placebo control trial and our HOPE-2 open-label extension trial*

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*compared to patient-level natural history data from the DMD Cardiac Consortium led by Dr. Jonathan Soslow at Vanderbilt University. Many factors have given us confidence in our BLA submission pathway.*

*First and foremost, it has a strong safety profile and has been administered to over 250 human subjects across several clinical trials over multiple years. Equally as important is that the data continues to show clinical and statistically significant efficacy in the treatment of DMD cardiomyopathy. This data is foundational to our BLA filing.*

I would also like to point out that, it has become well-known that the cardiac and skeletal aspects of the disease do not decline at the same rate. *So therefore, because we see an impact on both cardiac and skeletal muscle function, we are confident that we are seeing a treatment effect of deramiocel across multiple domains, further strengthening the opportunity to treat DMD with deramiocel.*

57.    Marbán further commented, in response to an analyst:

Q: Joseph Pantginis – H.C. Wainwright & Co. – Analyst: And then I guess second question is, obviously, you have no indication that there's going to be an AdCom right now. When do you think you might hear an answer? And for example, if there were an AdCom, would that be a place that they might want to not necessarily require but maybe force a discussion regarding HOPE-3?

A: Marbán: Yes. So we're waiting every day to hear from them on whether they would want an AdCom. They will need some time to put it together. And even though we're actively prepping for one as we speak, they have to give us time to prepare as well. So we expect to hear soon.

I think part of the delay is just based on some of the turmoil that's going on in the government right now. And so I expect that things are moving at a different pace than they might have even just a few months ago. So stay tuned. When we know, we will let everybody else know. *We see an AdCom neither as a benefit nor a risk. We believe very strongly in our application. We have clinically and statistically significant data. The data stands on its own. However, if we need to get up there and*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*talk about it, we will absolutely do that.*

In terms of HOPE-3, what they have told us is that they are not considering HOPE-3 for this biologics license application that they understand that the primary efficacy endpoint of HOPE-3 is skeletal muscle that, that would be used for post-approval label expansion. We plan on taking HOPE-3 potentially outside the U.S. to order to expand our global footprint.

*And the focus of this application as we and they understand it is the data that we've talked about, which is the HOPE-2 data, the HOPE-2 open-label extension data compared to the natural history data set from the Cardiac Consortium. And so I don't anticipate a discussion of HOPE-3 at an AdCom, but if it comes up, we'll be ready to take those questions as well.*

58.     On May 5, 2025, the Company issued a press release wherein it reported that it completed its mid-cycle review meeting with the FDA regarding deramiocel for the treatment of DMD. The Company reported that the package was on track for a PDUFA action date of August 31, 2025, that there were no significant deficiencies identified by the review committee, and that the FDA confirmed its intent to hold an advisory committee meeting.

59.     In the press release, Marbán commented:

*The successful completion of our mid-cycle review meeting along with the upcoming advisory committee meeting represents major milestones on the path towards approval of deramiocel.* Deramiocel is a first-in-class cellular therapy with the potential to halt or slow the progression of DMD-cardiomyopathy, and we are pleased to have the opportunity to present the efficacy and safety data to the advisory committee. *We have been actively preparing for an advisory committee meeting, and we look forward to providing the physician and patient perspectives to highlight the weight of evidence supporting the transformative potential of deramiocel in treating*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***DMD-cardiomyopathy.***

60.    Following this news, the Company's stock price fell from $10.30 per share on May 5, 2025 to $7.30 per share on May 6, 2025.

61.    On May 13, 2025, the Company held an earnings call, during which Marbán stated:

> Our path with FDA to this point has been smooth, and FDA has not fallen behind in any way. Our objectives, deliverables and time lines remain on track. There has also been concern expressed over the announcement of an FDA advisory committee meeting for Capricor.
>
> ***I want to highlight that having the opportunity to participate in an AdCom is a positive step for Capricor, for deramiocel and for the program as a whole because it gives us the opportunity to showcase the strong scientific and clinical data that is the basis of our BLA. We do not believe nor has FDA signaled that the determination to hold an AdCom has anything to do with weaknesses in the application, but rather, we believe the nature of a first-in-class therapy for a new indication warrants additional feedback from subject matter experts in the field as well as giving the advocacy and patient community an opportunity to voice their opinion on deramiocel.***
>
> The AdCom also affords us the opportunity to highlight that deramiocel has a strong safety record demonstrated in over 700 infusions, treating over 250 patients with some subjects receiving deramiocel infusions for almost 5 years. We are asking for approval for a therapy that has been shown to be generally safe and effective for the treatment of DMD cardiomyopathy for which there are no approved therapies. . . .
>
> ***I would now like to discuss the data that supports our BLA. The filing is based on our blinded, randomized and placebo-controlled HOPE-2 study and also by the HOPE-2 open-label extension study compared to a robust FDA and NHLBI-funded natural history data set. While sample sizes are small, what is most relevant is not the size of the data set, but that the statistically and clinically significant differences are highly unlikely to be due to chance. We have worked with multiple***

***internal and external statisticians, presented the data at meetings and to KOLs.*** And what we have heard, seen and acted upon was that the likelihood is extremely low that the impact on the heart or for that matter, the skeletal muscle is due to chance.

We have 3 clinical trials and approximately 4 years of open-label extension data that supports that premise. There has also been an emphasis and written guidance from FDA encouraging the use of real-world evidence to support clinical trial data, especially in rare diseases. Deramiocel is a perfect case for using this type of data to validate the efficacy of a drug product.

62.     On June 20, 2025, *Stat News* reported that Prasad, director of the FDA's CBER, canceled the advisory committee meeting regarding deramiocel after being uncertain about the deramiocel's efficacy and safety and "skeptical of the treatment."

63.     On June 24, 2025, the Company issued a press release wherein it reported that the FDA canceled the advisory committee meeting but intended to conduct an in-person late-cycle review meeting in mid-July. The press release provided that the BLA remained under priority review with a PDUFA target action date of August 31, 2025 and that four-year data presented at the Parent Project Muscular Dystrophy Conference showed sustained cardiac function.

64.     In the press release, Marbán commented:

We remain confident in the strength of our submission and continue to advance toward potential approval, with our next major step being the upcoming late-cycle review meeting. To date, all regulatory milestones have proceeded as expected, including a successful pre-license inspection and a mid-cycle review with no major issues. Our application remains under Priority Review, and we believe we are well positioned as we move toward our PDUFA date. We continue to work closely with the FDA and remain encouraged by the progress of our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

review.

65.    The above-referenced statements were materially false and/or misleading in that they failed to disclose material adverse facts regarding the four-year safety and efficacy data from the Company's Phase 2 HOPE-2 trial study, and created the false impression that Defendants could obtain first approval for DMD cardiomyopathy.

**Proxy Statement**

66.    On April 8, 2025, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2025 Proxy Statement"). The 2025 Proxy Statement solicited the Company's stockholders:

1.    To elect the eight (8) nominees named in this proxy statement to the Company's board of directors to serve for a one-year term expiring at our 2026 Annual Meeting of Stockholders;

2.    To ratify the appointment of Rose, Snyder & Jacobs LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025;

3.    To approve the adoption of the Capricor Therapeutics 2025 Equity Incentive Plan;

4.    To approve, by non-binding advisory vote, the resolution approving named executive officer compensation; and

5.    To transact such other business as may properly come before the Annual Meeting or any adjournment or postponement thereof.

67.    With respect to Item 1 above, the 2025 Proxy Statement provided:

26
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Our Board recommends that the nominees below be elected as member of the Board at the Annual Meeting:

| Name | Age* | Positions Held | Director of Company Since |
|---|---|---|---|
| Linda Marbán, Ph.D. | 61 | President, Chief Executive Officer and Director | 2013 |
| Frank Litvack, M.D. | 69 | Executive Chairman and Director | 2013 |
| David B. Musket | 67 | Director | 2013 |
| George W. Dunbar Jr., M.B.A. | 78 | Director | 2013 |
| Karimah Es Sabar | 67 | Director | 2021 |
| Paul Auwaerter, M.D., M.B.A. | 63 | Director | 2023 |
| Philip Gotwals, Ph.D. | 62 | Director | 2023 |
| Michael Kelliher | 48 | Director | 2023 |

. . . THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" EACH NAMED NOMINEE.

68.     With respect to Item 3 above, the 2025 Proxy Statement stated:

Proposal No. 3 seeks stockholder approval of the Capricor Therapeutics, Inc. 2025 Equity Incentive Plan (as may be amended and restated from time to time, the "2025 Plan"), which was approved by our Board on April 8, 2025, and is subject to approval by our stockholders. . . .

The 2025 Plan permits the Board, or a committee thereof, to grant to eligible team members, non-employee directors and consultants of the Company non-statutory and incentive stock options, stock appreciation rights (also known as SARs), restricted stock awards, and restricted stock units. Subject to adjustment, the maximum number of shares of our common stock authorized for issuance under the 2025 Plan is 3,500,000, together with certain permitted addbacks to the share reserve. The number of shares of our common stock authorized for issuance under the 2025 Plan shall automatically increase on January 1 of each year, commencing with January 1, 2026 and ending on January 1, 2035, by an amount equal to 5% of the outstanding shares of our common stock as of the last day of the immediately preceding fiscal year (rounded down to the nearest whole share). The closing stock price of a share of our common stock, as reported on Nasdaq on April 7, 2025, was $9.18 per share. . . .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" PROPOSAL NO. 3.

69.    With respect to Item 4 above, the 2025 Proxy Statement provided:

Under the Dodd-Frank Wall Street Reform and Consumer Protection Act and Section 14A of the Exchange Act, our stockholders are entitled to vote to approve, on an advisory basis, the compensation of our named executive officers as disclosed in this proxy statement in accordance with SEC rules. Consistent with the preference expressed by our stockholders at the last advisory vote on the frequency of our "say-on-pay" vote, we are conducting such vote annually. This vote is not intended to address any specific item of compensation, but rather the overall compensation of our named executive officers and the philosophy, policies and practices described in this proxy statement. . . .

Accordingly, the Board is asking our stockholders to indicate their support for the compensation of our named executive officers as described in this proxy statement by casting a non-binding advisory vote "FOR" the following resolution:

"RESOLVED, that the compensation paid to Capricor Therapeutics' named executive officers, as disclosed in the proxy statement for the 2025 Annual Meeting of Stockholders of Capricor Therapeutics pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the 2024 Executive Compensation, compensation tables and related narrative discussion, is hereby APPROVED on an advisory, non-binding basis." . . .

THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" PROPOSAL NO. 4.

70.    The 2025 Proxy Statement further stated:

Role of the Board in Risk Oversight

We face a variety of risks, including operational risks, such as cybersecurity risks, as well as risks associated with the significant financial needs to operate our business. The Board and each of its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

committees are involved in overseeing risk associated with our business operations. The Audit Committee reviews and discusses with management and the independent registered public accounting firm our guidelines and policies with respect to risk assessment and risk management, including our major financial risk exposures and the steps taken by management to monitor and control such exposures. The Audit Committee determines and approves, prior to commencement of the audit engagement, the scope and plan for the internal audit and confers with management and the independent registered public accounting firm regarding the scope, adequacy and effectiveness of internal controls over financial reporting, including any special audit steps taken in the event of a material control deficiency. The Audit Committee also reviews with management and the independent registered public accounting firm any fraud, whether or not material, that includes management or other employees who have a significant role in our internal controls over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses. Furthermore, the Audit Committee establishes procedures for the receipt, retention and treatment of complaints that we receive regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by our employees of concerns regarding questionable accounting or auditing matters.

It is the role of the Nominating and Corporate Governance Committee to review, discuss and assess, along with input from senior management, the performance of the Board and the committees of the Board at least annually. The Nominating and Corporate Governance Committee is responsible for developing and making recommendations to the Board for approval, and periodically reviewing with our Chief Executive Officer, the plans for succession to the offices of our Chief Executive Officer and other executive officers and the selection of appropriate individuals to succeed to executive positions.

It is the role of the Compensation Committee to review, at least annually, our compensation philosophy and to review and approve (or, if it deems appropriate, recommend to the Board for determination and approval) the compensation of our executive officers, senior management and non-employee directors, taking into consideration the

29
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

individual's success in achieving his or her individual performance goals and objectives and the corporate performance goals and objectives deemed relevant to him or her, as established by the Compensation Committee, in addition to other factors. The Compensation Committee reviews and recommends to the Board for approval the frequency with which we conduct say-on-pay votes, taking into account the results of the most recent stockholder advisory vote on the frequency of such say-on-pay votes, and reviews and approves the proposals regarding the say-on-pay vote and the frequency of the say-on-pay vote to be included in each of our annual meeting proxy statements, as applicable. It is also the role of the Compensation Committee to review, at least annually, our incentive compensation arrangements to determine whether they encourage excessive risk-taking, review and discuss the relationship between our risk management policies and practices and compensation, and evaluate compensation policies and practices that could mitigate such risk.

Code of Business Conduct and Ethics

The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that applies to all directors, officers, employees, consultants, contractors and agents, wherever they are located and whether they work for us on a full- or part-time basis. The Code of Ethics was designed to help such directors, employees and other agents to resolve ethical issues encountered in the business environment. The Code of Ethics covers topics such as conflicts of interest, compliance with laws, confidentiality of Company information, encouraging the reporting of any violations of the Code of Ethics, fair dealing and protection and use of Company assets.

A copy of the Code of Ethics, as adopted by the Board, and revised in April 2021, is available at the Corporate Governance page of our website at www.capricor.com. We may post amendments to or waivers of the provisions of the Code of Ethics, if any, made with respect to any directors and employees on that website. Please note that information contained on, or that can be accessed through, our website is not incorporated by reference and is not a part of this proxy statement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

71.    The 2025 Proxy Statement was materially false and misleading because, *inter alia*: (i) the Individual Defendants failed to disclose material adverse facts regarding the four-year safety and efficacy data from the Company's Phase 2 HOPE-2 trial study, and created the false impression that Defendants could obtain first approval for DMD cardiomyopathy; (ii) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; (iii) the Individual Defendants violated the Company's Code of Conduct; and (iv) the Individual Defendants failed to fulfill their risk oversight responsibilities.

72.    Due to the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to approve the Items referenced above.

**The Truth Emerges**

73.    On July 11, 2025, the Company issued a press release wherein it reported that it received a CRL from the FDA denying the BLA, indicating that it did not meet the statutory requirement for substantial evidence of effectiveness and citing the need for additional clinical data. The CRL also referenced outstanding items in the CMC section of the application. Marbán commented:

> *We are surprised by this decision by the FDA. We have followed their guidance throughout the process. Prior to the CRL, the review had advanced without major issues, including a successful pre-licensure inspection and completion of the mid-cycle review.* Capricor plans to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

submit data from the Phase 3 HOPE-3 clinical trial to provide additional evidence of effectiveness from an adequate and well-controlled study. The HOPE-3 trial is a randomized, double-blind, placebo-controlled clinical trial of 104 patients, with topline results expected in the third quarter of 2025. We believe these data, if positive, along with our existing long-term clinical results showing cardiac stabilization, preservation of skeletal muscle function, and a consistent safety profile, could support efforts to resolve the questions raised by the FDA for the treatment of cardiomyopathy associated with DMD. ***While this was an unexpected decision by the FDA, we remain committed to the DMD community to get Deramiocel through the approval process.***

74.    The Company held a call the same day, during which Marbán commented:

Q: Edward Andrew Tenthoff – Piper Sandler & Co. – Analyst: When it comes to the BLA, the response to the CRL, as you laid out, when do you think you might be able to respond to the CRL?

A: Marbán: We are working directly with the agency now. So in the CRL, they open the door for an informal teleconference to discuss and quoting the letter, path to approval. They've also suggested a follow-up to that. We could actually request a Type A meeting in addition. So they're anxious to work with us. I think they could not include HOPE-3 opportunity in the CRL because it was not part of this initial application.

We're going to work closely with the agency to build HOPE-3 to be exactly what we need to get this BLA across the line. This BLA is for the cardiomyopathy. Therefore, the simplest path to approval is to see if they'll take HOPE-3 for the cardiomyopathy to treat DMD. And of course, there's a broader application in terms of skeletal muscle as well and we look forward to feedback from them.

Q: Leland James Gershell – Oppenheimer & Co. – Analyst: I wanted to just clarify with respect to sort of dividing between the observations that have been made and the statistical analyses that have been applied.

A: Marbán: This is the crux of the matter, right? So -- and this is where colloquially, the rubber meets the road. ***So obviously, FDA had raised concerns about the initial analysis of the HOPE-2 clinical data. That conversation has been back and forth with the agency literally for years.***

Let me just explain for a minute exactly how we get to the statistical significance and what we've been going back and forth with the agency on and, in fact, got over the hump in August of 2024 in our meetings with the agency. And that was that the original model that was designed for HOPE-2 was based on an 84-patient trial. Because of the early unblinding, there was an imbalance in the distribution. So a normally distributed curve was what the original model was based on. You have to meet the assumption of a normal distribution in order to do that analysis. Once the violation of a normal distribution occurs, you must use a nonparametric analysis, and our statisticians have talked to the agency about this in great detail.

When you apply the nonparametric analysis, you then have a very robust statistical significance of the performance of the upper limb, 1.2 mid in HOPE-2, which then leads to all of the other secondary endpoints, achieving statistical significance, most importantly being left ventricular ejection fraction. The agency had accepted that. ***That was one of the topics that was discussed in the meeting in August of 2024. And now they've gone back to a little bit more of their traditional dogma of the fact that it did not meet the original model assumptions.***

Q: Kristen Brianne Kluska – Cantor Fitzgerald & Co. – Analyst: First, was there anything that they said about the data itself being clinically or not clinically meaningful? Or is the sense here that it was just more on the magnitude, the way the study was statistically analyzed beyond what you just said for HOPE-2 and the number of patients?

A: Marbán: ***Yes, it seems mostly that the argument is around the statistical analysis. So in HOPE-2, the concept was, as I just explained, when Leland asked his question, was in the model assumptions and whether to use a parametric normal distribution or a nonparametric model, which was obviously acceptable to the statistical reviewers at the Lancet and to some of the previous***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***reviewers at the Food and Drug Administration.***

75.    Following this news, the Company's stock price fell almost thirty-four percent, from a close of $11.40 per share on July 10, 2025 to $7.64 per share on July 11, 2025.

76.    As a result of the foregoing, the Securities Class Action was filed against the Company and Marbán, captioned *Leong v. Capricor Therapeutics, Inc.*, Case No. 3:25-cv-01815 (S.D. Cal.).

77.    The Securities Class Action has caused, and will continue to cause, Capricor to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

79.    Capricor is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

80.    Plaintiff is a current shareholder of Capricor and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

81.    A pre-suit demand on the Board of Capricor is futile and, therefore, excused. The Board consists of Individual Defendants Litvack, Marbán, Auwaerter, Dunbar, Gotwals, Kelliher, Musket, and Es Sabar.

82.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

83.    The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

84.    Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

85.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

86.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

87.     Individual Defendants Dunbar, Musket, and Es Sabar are not disinterested or independent.  Dunbar, Musket, and Es Sabar are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Dunbar, Musket, and Es Sabar knowingly or recklessly allowed the issuance of the aforementioned improper statements.

88.     Defendants Dunbar and Es Sabar are not disinterested or independent. Dunbar and Es Sabar are members of the Nominating and Corporate Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company.  Dunbar and Es Sabar failed to review

regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

89.    Individual Defendants Litvack, Marbán, Auwaerter, Dunbar, Gotwals, Kelliher, Musket, and Es Sabar are not disinterested or independent. Litvack, Marbán, Auwaerter, Dunbar, Gotwals, Kelliher, Musket, and Es Sabar caused the issuance of the 2025 Proxy Statement. As alleged above, due to the Individual Defendants' materially false and misleading statements in the 2025 Proxy Statement, the Company's stockholders voted to approve Items 1-5 in the 2025 Proxy Statement, including the election of the Individual Defendants to the Board and the approval of the named executive officer compensation. Thus, Litvack, Marbán, Auwaerter, Dunbar, Gotwals, Kelliher, Musket, and Es Sabar are not disinterested or independent, and demand upon them would be futile.

90.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to the Company's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

91. Individual Defendant Marbán is not disinterested or independent. Marbán is CEO of the Company, and she derives substantial compensation from her relationship with the Company. As alleged above, Marbán was directly involved in and perpetrated the scheme alleged herein. Moreover, Marbán was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities Class Action based on substantially the same wrongdoing alleged herein. Thus, Marbán is not disinterested or independent.

92. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

93.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

94.    Accordingly, for all of the reasons set forth above, at least a majority of the Company's current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## <u>COUNT I</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

95.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

97.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

98.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

100.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

allegation contained above, as though fully set forth herein.

102.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

103.   Plaintiff, on behalf of Capricor, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

104.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Capricor.

106.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Capricor that was tied to the performance or artificially inflated valuation of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Capricor, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

107.  Plaintiff, as a shareholder and a representative of Capricor, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

108.  Plaintiff on behalf of Capricor has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

109.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

111.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

112.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

113.   Plaintiff, on behalf Capricor, has no adequate remedy at law.

## COUNT V

**Against Individual Defendant Marbán for
Contribution Under Sections 10(b) and 21D of the Exchange Act**

114.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.   Capricor and Individual Defendant Marbán are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Marbán's willful and/or reckless violations of her obligations as an officer and director of Capricor.

116.   Defendant Marbán, because of her position of control and authority as an officer and director of Capricor, was able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Capricor, including the wrongful acts complained of herein and in the Securities Class Action.

117.   Accordingly, Marbán is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

118.    As such, Capricor is entitled to receive all appropriate contribution or indemnification from Marbán.

119.    Plaintiff, on behalf Capricor, has no adequate remedy at law.

## COUNT VI

**Against the Individual Defendants for Violations of Section 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

122.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

44

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

123.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9

124.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy Statement, which was filed with the SEC.

125.   As alleged above, the 2025 Proxy Statement was materially false and misleading because, *inter alia*: (i) the Individual Defendants failed to disclose material adverse facts regarding the four-year safety and efficacy data from the Company's Phase 2 HOPE-2 trial study, and created the false impression that Defendants could obtain first approval for DMD cardiomyopathy; (ii) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; (iii) the Individual Defendants violated the Company's Code of Conduct; and (iv) the Individual Defendants failed to fulfill their risk oversight responsibilities.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

126.    The misrepresentations and omissions in the 2025 Proxy Statement were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the reelection of certain Individual Defendants and the approval of the named executive officer compensation.

127.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

128.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

129.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

•      strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

•      strengthening the Company's internal reporting and financial disclosure controls;

•      developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

•      strengthening the Board's internal operational control functions;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: August 1, 2025                    **RIGRODSKY LAW, P.A.**

                                         */s/ Gina M. Serra*
**OF COUNSEL:**                    By:   Gina M. Serra (#361172)
                                         1091 N. Palm Canyon Drive, Suite 9
**GRABAR LAW OFFICE**                    Palm Springs, CA 92262
Joshua H. Grabar                         Telephone: (760) 406-8009
One Liberty Place                        Email: gms@rl-legal.com
1650 Market Street, Suite 3600
Philadelphia, PA 19103                   *Attorneys for Plaintiff*
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT